1
2
3
4
5
6
7
8
9
10

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**

11
12
13
14
15
16
17

| | |
|---|---|
| ALAN ANGELES and NATALY ANGELES. Plaintiffs, vs. JEH C. JOHNSON, Secretary of Homeland Security, et al. Defendants. | Case No.: 13-cv-00008-BTM-RBB **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

18
19
20
21
22
23
24
25
26
27
28

Presently pending before the Court are the parties' cross motions for summary judgment in a matter arising under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701- 706. The challenged agency action is Defendant's, United States Citizenship and Immigration Services ("USCIS" or the "Agency"), denial of Plaintiffs', Nataly and Alan Angeles, Application to Register Permanent Residence or Adjust Status, Form I-485, as derivative beneficiaries of a Petition for Alien Relative, Form I-130, filed

by their grandfather, Luis Herrera Angeles ("Luis") on behalf of their father, Demetrio Angeles Moran ("Demetrio").

Having considered the parties oral argument and the record, the Court DENIES Defendant's motion for summary judgment [Doc. 35], and GRANTS Plaintiffs' motion for summary judgment [Doc. 34].

## I.      **BACKGROUND**

Luis immigrated to the United States from Mexico on October 5, 1976 under the then existing Western Hemisphere Program ("WHP"), and was classified as an "SA-1" immigrant according to his Immigrant Visa [Doc. 31-3, at 16]. Luis's son, Demetrio, was born in Mexico in 1960 and resided there at the time of his father's immigration [Doc. 35-2, at 2]. On June 7, 1977, after he became a legal permanent resident, Luis filed the Form I-130 in question on behalf of Demetrio, who was then a single minor. The Agency's predecessor, the Immigration and Naturalization Service ("INS"), approved the Form I-I30 on August 27, 1977 [Doc. 34, at 2; Doc. 35-1, at 8-9]. On February 14, 1978, Demetrio was issued an Immigrant Visa by the United States Consulate in Tijuana, Baja California, Mexico, and entered the United States on February 15, 1978 [Doc. 35-2, at 2]. Demetrio's visa shows that he was admitted with the immigrant classification symbol "SA-1" from foreign state or other area "w/h" and was occupied as a "student." [Id].

The visa also had the box checked confirming that Demetrio was statutorily exempt from the Immigration and Nationality Act ("INA") § 212(a)(14), 8 U.S.C. § 1182(a)(14), labor certification requirement, and included the additional note: "I-130 Attached." The meaning and implication of these symbols are at issue in this case. Additionally, the legal and factual questions of whether the Form I-130 was the vehicle for Demetrio's immigration remain disputed.

If the Form I-130 is found to be unused and therefore still valid, Plaintiffs could qualify for adjustment of immigration status to permanent legal resident based on the intersection of INA § 245(i), 8 U.S.C. § 1255(i) with INA § 204(l), 8 U.S.C. § 1154(l). INA § 245(i) allows certain "grandfathered" aliens who are in the United States illegally to adjust their status to lawful permanent resident under certain conditions, such as being the beneficiary of a qualifying Form I-130. A "grandfathered" alien includes a spouse or child of a beneficiary of a Form I-130 filed before April 30, 2001. 8 CFR 245.10(a). Plaintiffs are the children of a Form I-130 beneficiary, Demetrio.[1] Luis filed the Form I-130 on Demetrio's behalf in June of 1977, years before the April 30, 2001 cutoff date. The INA and its regulations do not place an expiration date on an approved Form I-130 and 8 C.F.R.

---

[1] See Matter of Estrada, 26 I. & N. Dec. 180, 184 (BIA 2013) (established that both principal and derivative "grandfathered aliens" are independently eligible for adjustment of status under INA §245(i)).

§ 204.2(h)(1) confirms that an approved family-based Form I-130 remains valid for the duration of the relationship to the qualifying beneficiary. Furthermore, INA § 204(l) gives the USCIS discretion to consider an approved Form I-130 to be valid for use by a surviving relative, such as Plaintiffs, despite the death of the qualifying beneficiary, here Demetrio. Defendant does not appear to challenge the application of INA § 204(l) to this case. [See Doc. 35-1, at 10 n.7].

Demetrio's children, Plaintiffs Alan and Nataly Angeles, were born on September 20, 1990, and December 31, 1992, respectively, in Tijuana, Baja California, Mexico [Doc. 31-2, at 30-31; Doc. 30-2, at 26-27].  Luis was naturalized on July 8, 1994, at which time Demetrio remained unmarried [Doc. 30-1, at 13; Doc. 31-2, at 59]. Demetrio passed away on October 11, 2009. [Doc. 31-2, at 56]. According to their Forms I-485, Alan and Nataly Angeles last entered the United States at or near the San Ysidro, California, port of entry in January 2006 and August 2007, respectively, without being admitted or paroled by immigration authorities [Doc. 30-1, at 30; Doc. 30-2, at 60; Doc. 31-2, at 8, 16].

The parties agree that if the Form I-130 was used as the vehicle of Demetrio's immigration, it is no longer available for use by Plaintiffs. However, if Demetrio's immigration was based on his status as a child of a WHP immigrant, "following to join" his father under that program, then the

Form I-130 was not used. Plaintiffs maintain that the Form I-130 remains approved and available for their use as a vehicle for immigration based on the combined effect of INA §§ 204(l), 8 U.S.C. § 1154(l) and 245(i), 8 U.S.C. § 1255(i). Defendant questions whether the Plaintiffs can use the Form I-130 even if it is found to be unused by Demetrio, since Plaintiffs were born after Demetrio immigrated [Doc 35-1, at p. 9 n.6].[2]

## II.      LEGAL STANDARD

The APA allows for judicial review of any final agency actions. See 5 U.S.C. §§ 701- 706. Executive agencies have expertise and experience in administering their statutes that no court can properly ignore. See Judulang v. Holder, 132 S. Ct. 476, 483 (2011). However, while courts generally defer to an agency's interpretation of the statute and regulations it is charged with administrating, this is not so when the interpretation is plainly erroneous or inconsistent with that statute or regulation. See Udall v. Tallman, 380 U.S. 1, 16-17 (1965). A court reviewing an administrative agency's decision must decide relevant questions of law, interpret statutory provisions as necessary, and set aside agency actions, findings, and

---

[2] This argument, grounded in 22 CFR 42.53(c), first appeared in the Agency's Notices of Intent to Deny issued on April 10, 2013 [Doc. 30-1, at 30; Doc. 31-2, at 1], and was rebutted by Plaintiffs in their identical replies on May 9, 2013 [Doc. 30-1, at 12; Doc. 31-1, at 44]. The Agency omitted this argument from its final decisions. The argument is questionable given the application of 22 CFR 42.53(c) to WHP applicants, and not to Plaintiffs, whose legal theory relies on the intersection of INA § 204(l), 8 U.S.C. § 1154(l) and INA § 245(i), 8 U.S.C. § 1255(i) in seeking to adjust their status using the Form I-130 and not any benefit under the former WHP.

conclusions that are (among other things) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2).

"A decision is arbitrary and capricious if the agency 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" O'Keeffe's, Inc. v. U.S. Consumer Prod. Safety Comm'n, 92 F.3d 940, 942 (9th Cir. 1996) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). In determining whether an agency decision was "arbitrary or capricious," the reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Marsh v. Oregon Natural Resources Council, 490 U.S. 306, 378 (1989). When reviewing an agency action, a court must examine the reasons for agency decisions, or, as the case may be, the absence of such reasons. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515, (2009).

However, the "arbitrary and capricious" standard of review only applies to limit judicial review of questions of fact found by the agency, and questions of law are freely reviewable by the courts. See, e.g., Nat'l Indus.

Sand Ass'n v. Marshall, 601 F.2d 689, 699-700 (3d Cir. 1979); United States v. Dahan, 369 F. Supp. 2d 1187, 1190-91 (C.D. Cal. 2005). Thus, the standard of review of a USCIS determination that an applicant is statutorily ineligible to adjust status as a matter of law and where facts are undisputed, is subject to review for errors of law. Salehpour v. I.N.S., 761 F.2d 1442, 1444-45 (9th Cir. 1985).

This matter involves a mixed question of fact and law, since the Agency's factual determination that "[Demetrio] did, in fact, use the Form I-130 filed by Luis Herrera Angeles to immigrate" was based in large part on its legal conclusion that Demetrio had to have used the Form I-130 to immigrate [Doc. 31-1, at 36; Doc. 30-1, at 5].

/ / /


### III.    DISCUSSION

#### A. Summary of Administrative Record

Defendant filed both Plaintiffs' administrative records documenting the challenged USCIS decisions on November 6, 2014 [Doc. 18].

Plaintiff Alan Angeles ("Alan") filed his Form I-485 requesting adjustment of status under INA § 245(i) on September 19, 2011. He appeared for an interview before USCIS related to that application on

January 23, 2012 [Doc. 31-2, at 16]. A redacted email correspondence from Alan's counsel to the Department of Homeland Security ("DHS") dated July 19, 2012, states that he did not receive a Notice of Intent to Deny ("NOID") prior to receiving the Agency's Notice of Decision ("ND"), dated May 31, 2012, and argues that Mr. Angeles was denied an opportunity to rebut its reasoning [Doc. 31-3, at 42; 31-2, at 16]. For unspecified reasons, USCIS subsequently sent a notice of Agency Motion to Re-open the Matter on March 1, 2013, and an Amended Agency Motion to Re-open on March 5, 2013, stating that the Agency had determined to re-evaluate its prior decision [Doc. 31-1, at 7, 9]. On April 10, 2013, USCIS sent a NOID denying approval of Alan's Form I-485 [Doc. 31-1, at 60]. Through counsel, Alan replied to the NOID on May 9, 2013, rebutting the Agency's reasoning [Doc. 31-1, at 41]. On July 18, 2013, USCIS sent Alan its final Decision denying his Form I-485, and stating that he could not appeal the decision [Doc. 31-1, at 34].

The majority of Plaintiff Nataly Angeles's ("Nataly") administrative record tracks her brother's record, with slightly later dates. Nataly filed a Form I-485 on May 24, 2012 based on facts identical to Alan's Form I-485 [Doc. 30-1, at 29]. On August 23, 2012, she appeared for an interview related to that application. On September 10, 2012, USCIS sent a ND denying her application [Doc. 30-2 at 4]. Similarly to Alan, Nataly received a

notice of Agency Motion to Re-open the Matter on March 1, 2013, and an Amended Agency Motion to Re-open on March 5, 2013 [Doc. 30-2, at 2-3]. On April 10, 2013, USCIS sent a NOID [Doc. 30-1, at 29]. Nataly, through counsel, also sent a Reply to NOID on May 9, 2013, tracking the arguments made by Alan [Doc. 30-1, at 9]. On July 18, 2013, USCIS issued its final Decision denying Nataly's Form I-485 for the same reasons stated in the Decision denying Alan's application [Doc. 30-1, at 3].

Plaintiffs brought this APA challenge before the Court on January 2, 2013 [Doc. 1]. On September 29, 2014, the Court granted in part and denied in part Defendant's motion to dismiss for lack of subject matter jurisdiction and failure to state a claim [Doc. 18]. The parties filed the pending cross motions for summary judgment on January 8 and 9, 2015 [Docs. 34, 35].

### B. Summary of Applicable Immigration Law

Much of the argument in this case surrounds the complex change to the immigration system resulting from the INA Amendments of 1976, Pub. L. 94-571 (90 Stat. 2703) ("1976 Amendments"), which took effect on January 1, 1977. According to their legislative history, the goal of the 1976 Amendments was to "eliminate the inequities in existing law regarding the admission of immigrants from countries in the Western Hemisphere" . . . by

"extend[ing] to the Western Hemisphere the seven-category preference system, the 20,000 per-country limit, and the provisions for adjustment of status currently in effect for Eastern Hemisphere countries." H.R. Rep. 94-1553 (1976), 1976 WL 14063 (Leg. Hist.).

As implemented, the 1976 Amendments changed the prior WHP in existence since 1968, under which citizens of "independent" Western Hemisphere countries desiring to immigrate to the United States were defined as "special immigrants," were not categorized by a priority or preference system, and were admitted on a first-come first-served basis without a per-country quota. Id. at *2. The single restriction on prospective Western Hemisphere immigrants entering to perform skilled or unskilled labor was to obtain a certification from the Secretary of Labor indicating that his or her entry will not adversely affect the United States labor market. However, parents, spouses, and children of those "special immigrants" who had become United States citizens or legal permanent residents, and whom they were "accompanying, or following to join" at a later date, were exempted from this requirement. Id.; INA §§101(a)(27), 212(a)(14) (1965).

The 1976 Amendments integrated the Western and Eastern Hemisphere Programs under one immigration system, removed the "special immigrant" definition, and also deleted the exemption from the labor certification for the Western Hemisphere natives who were close

relatives of United States citizens and permanent residents, if they were "entering [the United States] to work." H.R. Rep. 94-1553 (1976), 1976 WL 14063 at *14-15. However, the new law also contained a "savings clause" at § 9(b) of Pub. L. 94-571, which continues to appear in the Amendments section of the current version of the INA. 8 U.S.C. § 1153 (2000), at 874.[3] Section 9(b) states that even though Western Hemisphere immigrants would now be moved from the "special immigrant" category of INA § 101(a)(27)(1965) to the "non-preference" visa category of INA § 203(a)(8), individuals who were registered with a consular office under the old WHP, before January 1, 1977, would preserve their old visa priority dates, which they could use with a visa petition under the new preference system entitling them to priority status, for instance, by virtue of marriage or a parent-child relationship. See id.; see also H.R. Rep. 94-1553 (1976), 1976 WL 14063 at *16.

---

[3] The language of Pub. L. 94–571 (HR 14535), October 20, 1976, 90 Stat 2703, states:

> An alien chargeable to the numerical limitation contained in section 21(e) of the Act of October 3, 1965 (79 Stat. 921), who established a priority date at a consular office on the basis of entitlement to immigrant status under statutory or regulatory provisions in existence on the day before the effective date of this Act shall be deemed to be entitled to immigrant status under section 203(a)(8) of the Immigration and Nationality Act and shall be accorded the priority date previously established by him. Nothing in this section shall be construed to preclude the acquisition by such an alien of a preference status under section 203(a) of the Immigration and Nationality Act, as amended by section 4 of this Act. Any petition filed by, or in behalf of, such an alien to accord him a preference status under section 203(a) shall, upon approval, be deemed to have been filed as of the priority date previously established by such alien. The numerical limitation to which such an alien shall be chargeable shall be determined as provided in sections 201 and 202 of the Immigration and Nationality Act, as amended by this Act.

## C. Analysis

Defendant maintains that the changes in immigration law described above ultimately impacted how Demetrio immigrated, with or without using a Form I-130, which today is still used by United States citizens and lawful permanent residents to establish a relationship to certain alien relatives wishing to immigrate to the United States.[4] As a matter of law, Plaintiffs may adjust their immigration status from undocumented to legal permanent residents as "derivative beneficiaries" of an unused Form I-130 filed by their grandfather on behalf of their father. See In re Villarreal–Zuniga, 23 I. & N. Dec. 886, 889 (BIA 2006) (stating that an approved Form I-130 visa petition cannot be reused to obtain a benefit, and implying that an unused form is valid); 8 C.F.R. § 204.2(h); see also Paet v. Medina-Maltes, No. 12-CV-3416, 2013 WL 5348375, at *4 (N.D. Ill. Sept. 24, 2013).

The Agency's decision denying each Plaintiff's application to adjust their status turned on the Agency's legal determination that Demetrio had no other vehicle for immigration other than the Form I-130. The Agency arrived at this conclusion on the basis of its interpretation of the "SA-1" notation on Demetrio's Immigrant Visa and the "savings clause" as showing "that, presumptively, Demetrio would have immigrated as a nonpreference

---

[4] I-130, Petition for Alien Relative, "Purpose of Form," Official Website of the Department of Homeland Security, *available at*: http://www.uscis.gov/i-130 (last accessed July 30, 2015*).*

immigrant subject to the labor certification requirement." [Docs. 31-1, at 36; 30-1, at 5]. The Agency concedes, however, that Demetrio's visa "shows that he was not required to have a labor certification," and the record does not suggest he had one [Id.]. Still, the Agency determined "that the proper conclusion is that he immigrated with the [Western Hemisphere priority date], but as the son of a [legal permanent resident]," since that familial status exempted him from a labor certification requirement [Id.]. This legal determination led the Agency to factually determine that Demetrio "did, in fact, use the Form I-130 filed by Luis Herrera Angeles to immigrate" and therefore, "it was no longer available as an 'approved' petition at the time of his death" so that each Plaintiff "cannot be said to be a derivate beneficiary of an approved petition." [Docs. 31-1, at 36; 30-1, at 5].

Reviewing the Agency's legal determination concerning the absence of an alternative to the Form I-130 *de novo*, the Court finds that the Agency's conclusion that Demetrio could not have possibly immigrated as a "following to join" child under the pre-1977 WHP is plainly erroneous and "not in accordance with the law," and must therefore be set aside. 5 U.S.C. § 706(2); Nat'l Indus. Sand Ass'n, 601 F.2d at 699. Specifically, Defendant's legal interpretation fails to consider the likelihood that Demetrio, a 16-year-old child of a WHP immigrant, was allowed to "follow to join" his father under the WHP. Although new WHP immigration had

technically ceased after January 1, 1977, a number of sources Plaintiffs submitted in their administrative records, which Defendant ostensibly ignored and failed to address, confirm that at the time of Demetrio's immigration in February 1978, he was exempt from the labor certification requirement not because he was the son of a legal permanent resident and beneficiary of a Form I-130, but because of the alternative immigration pathway still available to children "following to join" their WHP immigrant parents who had become permanent legal residents or American citizens.

The proper conclusion that Demetrio immigrated as a child "following to join" Luis under the WHP is confirmed by the markings on Demetrio's Immigrant Visa, contemporary primary and secondary sources interpreting the 1976 Amendments, and the effect of the <u>Zambrano v. Levi</u>, No. 76-c-1456 (N.D. Ill. June 21, 1977) and <u>Silva v. Bell</u>, 605 F.2d 978 (7th Cir. 1979) court decisions.

First, the markings on Demetrio's visa, issued on February 14, 1978, a day before he entered the United States, as well as his Permanent Resident Card, confirm that he was exempt from the labor certification requirement of

/ / /

/ / /

/ / /

/ / /

INA § 212(a)(14) because he immigrated as a child "following to join" his father under the WHP [Docs. 35-2, at 2; 31-3, at 2; 30-3, at 23]. Both documents state that Demetrio's immigration category was "SA-1," a notation that the State Department and INS used to denote   WHP immigrants. Secondary publications from 1994 submitted by Plaintiffs and uncontested by Defendant define "SA-1" as "alien born in independent Western Hemisphere country." [Docs. 38, at 5; 38-1, at 3; 35-1, at 21]. "SA-1" is also the immigrant category shown in Luis's WHP Immigrant Visa from October 1976 [Doc. 35-2, at 3].

The fact that "SA-1" appears in Luis's and Demetrio's documents supports Plaintiffs' argument that Demetrio, like Luis, was a WHP immigrant and didn't use a Form I-130, regardless of whether it was available to him. Additionally, the fact that two government agencies, the Department of State's consulate in Tijuana, Mexico and the INS, both independently classified Demetrio as an "SA-1" immigrant in his Immigrant Visa and Permanent Resident Card supports the argument that the classification was not a clerical error and accurately reflected his immigration category under the WHP. The Agency does not suggest that any of Demetrio's immigration

/ / /

/ / /

/ / /

documents in the record are fraudulent, or that any inconsistencies therein demonstrate that they relate to some other matter.

Second, the Agency's statement in its Decision letters to Plaintiffs that "[t]he 'SA-1' notation on [Demetrio's] visa cannot possibly mean he immigrated as a Western Hemisphere special immigrant" because "[t]hat classification no longer existed on February 15, 1978" is incorrect because "SA-1" appears to have been recognized by the INS and State Department as a viable immigrant category for specific purposes. For example, as of April 1, 1977, 22 CFR 42.61(a)(3)(iii) was revised to advise State Department Foreign Service Officers posted in United States consulates abroad to maintain waiting lists of immigrant classifications, including those "entitled to special immigrant status under INA § 101(a)(27)."

Additionally, after the 1976 Amendments became effective, the court in Zambrano v. Levi, No. 76-C-1456 (N.D. Ill June 21 1977) ruled that the INS had improperly charged approximately 144,999 Cuban refugee adjustment numbers to the Western Hemisphere quota, depriving others on the waiting lists of available visa numbers, and ordered the government to recapture and reissue them to the plaintiffs. In a related class action, Silva v. Bell, 605 F.2d 978, 986 (7th Cir. 1979), the court ordered that the visa numbers erroneously charged be allocated among the Western Hemisphere applicants on waiting lists in accordance with historical

immigration pattern for countries involved, and particularly to benefit prospective Mexican immigrants who had overwhelmingly been harmed by the misallocation. In response, the State Department issued a bulletin to foreign consulates on July 25, 1977, requiring that "Mexican applicants with priority dates before January 1, 1977 will be processed, within the 144,946 numbers, as special immigrants (SA) and that the SA category is presented current." [Doc. 38-1, at 19.]. These court orders and the documentation of their implantation provides additional proof of the post-January 1, 1977 viability of the SA-1 category and Demetrio's potential inclusion in the class of reallocated visa numbers given his inheritance of Luis's pre-January 1, 1977 Western Hemisphere priority date.

Lastly, the Agency's interpretation of the "SA-1" notation in Demetrio's Immigrant Visa to mean that he was only permitted to use Luis's Western Hemisphere 1976 priority date under the savings clause is unpersuasive. First, "SA-1" clearly appears on Demetrio's Permanent Resident Card, issued several years after his immigration [Doc. 31-1, at 36; Doc. 30-1, at 4-5] and after full implementation of the 1976 Amendments. Second, the Agency provided no evidence of immigration authorities using "SA-1" to denote nonpreference immigrants under the post-1977 system.

/ / /

/ / /

Furthermore, the Court is persuaded that "P22" is the more accurate symbol to have been used in Demetrio's Immigrant Visa had he been admitted using the Form I-130. Plaintiff's submission in exhibit 1 to Doc. 38-1 defines P22 as "unmarried son or daughter of lawful permanent resident alien (2nd preference)." And though "P2-2" is handwritten in the corner of Demetrio's approved Form I-130, it does not appear in the Immigrant Visa ultimately grating him entry to the United States. [Doc. 35-2, at 1, 2]. <u>See Hernandez v. Ashcroft</u>, 345 F.3d 824, 845 (9th Cir. 2003) ("We do not believe that the [USCIS] intends to advocate for a rule whereby an applicant may rely upon government documents only if he or she is able to explain every notation upon them."). Thus, since Demetrio's visa classified him as "SA-1" and not "P22", the Court is persuaded that he was not admitted under the latter category. <u>See also Corniel-Rodriguez v. INS</u>, 532 F.2d 301, 304 n.10 (2d Cir. 1976) (an unmarried daughter of a permanent legal resident was designated SA-1 and exempt from filing a labor certification for "following to join" her father under the WHP in 1967).

/ / /

/ / /

/ / /

/ / /

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant's argument that Demetrio was not admitted to the United States under the WHP because he was not exempted from the labor certification by the "savings clause" and therefore could only enter without that certificate by using the Form I-130 and Luis's October 5, 1976 priority date is also unsupported by the evidence. The notation "I-130 Attached" typed in the box confirming that Demetrio was exempt from the labor certification may mean that his classification as an unmarried son of a legal permanent resident exempted him from INA 212(a)(14). However, Demetrio would have also been exempt from the labor certification requirement by virtue of his status as a child "following to join" his father under the WHP. <u>See</u> 24 CFR 42.91(a)(14)(ii)(b).[5] Thus, the notation may have alternatively served as proof of the parent-child relationship between Demetrio and Luis for purposes of establishing the "following to join" immigration pathway and its exemption from the labor certification.

/ / /

/ / /

/ / /

/ / /

/ / /

---

[5] "The following persons are not considered to be within the purview of section 212(a)(14) and do not require a labor certification: (b) a spouse or child accompanying or following to join an alien spouse or parent who either has a labor certification or is a nondependent alien who does not require such a certification." 24 CFR 42.91(a)(14)(ii)(b).

The likelihood that Demetrio continued to be exempt from the labor certification as a "following to join" child under the WHP in 1978 is confirmed by the Interpreter Releases, Vol. 53, Nos. 43 and 50, from November and December 1976, issued in anticipation of the then forthcoming implementation of the 1976 Amendments.[6] These secondary sources outline the INS's guidelines for the 1976 Amendments and the State Department's administrative interpretations thereof, with particular focus on the "savings clause" in §9(b) [Doc. 38-1, at 33]. The Interpreter Releases confirm that even after the 1976 Amendments went into effect, the exemption from a labor certification was preserved for spouses and children of lawful permanent residents who had established their WHP priority date by either being registered on a consular waiting list prior to January 1, 1977 or sending in their applications for registration prior to that date [Doc. 38-1, at 23, 27]. While there is no direct evidence in the record one way or the other as to whether Luis had registered Demetrio on a consular waiting list prior to January 1, 1977, the SA-1 designation on Demetrio's visa is strong circumstantial evidence that he had been on the waiting list.

/ / /

---

[6] The authenticity and authority of the Interpreter Releases as a contemporary visa news bulletin was uncontested by the Agency at oral argument.

Defendant does not dispute that Demetrio was a native of the Western Hemisphere, whose established priority date was the same as his father's, dating back to 1976, and that he was the child of a legal permanent resident alien, Luis [Doc. 35-1, at 17]. Therefore, if Demetrio established his priority date with a United States consulate, then he remained exempt from the labor certification when he immigrated in 1978. Though the record is unclear as to whether Demetrio's application was received and/or registered at a United States consulate prior to February 14, 1978, the date he was issued his Immigrant Visa by the American Consulate in Tijuana, Baja California, Mexico, the record contains no evidence to the contrary. Thus, the Court is satisfied that Demetrio was exempted from the labor certification of INA § 212(a)(14) without the Form I-130.

Defendant's reasoning also assumes that after January 1, 1977, the "following to join" procedure available to spouses and children of WHP immigrants completely vanished. In fact, this immigration pathway continues to benefit close relatives of certain visa holders even today, as confirmed by the USCIS Website.[7] According to the USCIS:

/ / /

---

[7] "Bringing Children, Sons and Daughters to Live in the United States as Permanent Residents," Official Website of the Department of Homeland Security, *available at* http://www.uscis.gov/family/family-us-citizens/children/bringing-children-sons-and-daughters-live-united-states-permanent-residents (last accessed July 31, 2015).

1
2
3
4
5
6

> If you were married and/or had children who did not obtain permanent residence at the same time you did, they may be eligible for follow-to-join benefits. This means that you do not have to submit a separate Form I-130 for your spouse and/or children. In addition, your spouse and/or children will not have to wait any extra time for a visa number to become available. In this case, you may simply notify a U.S. consulate that you are a permanent resident so that your spouse and/or children can apply for an immigrant visa. Id.

7
8
9
10
11
12
13
14

Defendant presented no evidence that Luis did not take the necessary step of notifying the United States consulate of his legal permanent resident status. Indeed, the Form I-130 he filed for Demetrio provided such notice. Thus, Demetrio could have "followed to join" Luis over one year after the 1976 Amendments became effective.

15
16
17
18
19
20
21
22
23

        As the aforementioned evidence demonstrates, the Agency's underlying legal conclusion, announced in both Alan and Nataly's Decision letters, that the "SA-1 notion on [Demetrio's] visa cannot possibly mean he immigrated as a Western Hemisphere special immigrant," is incorrect as a matter of law [Docs. 31-1, at 35-36; 30-1, at 4]. Therefore, the Agency's resulting factual conclusion that Demetrio "did, in fact, use the Form I-130 filed by Luis Herrera Angeles to immigrate," [Docs. 31-1, at 36; 30-1, at 5],

24
/ / /
25
/ / /
26
27
/ / /
28

is arbitrary and capricious because it is based purely on speculation, and wholly fails to address evidence to the contrary presented by Plaintiffs in their identical replies to the NOID. In sum, Plaintiffs have demonstrated that Demetrio's Form I-130 was not used and it may be available for Plaintiffs' use.

## IV.    <u>CONCLUSION</u>

For the reasons discussed above, Defendant's motion for summary judgment is **DENIED** and Plaintiffs' motion for summary judgment is **GRANTED**. The matter is **REMANDED** to the Agency for further proceedings in processing the Plaintiffs' Forms I-485 in accordance with this Order. Since the Court has spent considerable time studying this old record, it retains jurisdiction in the event of further proceedings under the APA in respect to Plaintiffs' application to adjust status. L.R. Civ. P. 40.1(e).

Dated:  August 4, 2015

Barry Ted Moskowitz, Chief Judge
United States District Court